The next case on the docket today is agenda number two, number 129-208, People of the State of Illinois v. Cortez Turner. Counsel for the appellant, are you prepared to proceed? I am, Your Honor. Thank you. May it please the Court, Counsel. Good morning, Your Honors. Richard Whitney representing defendant appellant Cortez Turner. Your Honors, we are here today in defense of the proposition that when a patient is in a hospital room with four walls and a door, that person has a reasonable expectation of privacy for Fourth Amendment purposes. Now, in this case, we have repeated that phrase, four walls and a door, quite a bit. But if we have placed considerable emphasis on this, it is because in the Fourth Amendment context, where we must draw lines on when and where people have a reasonable expectation of privacy that protects them from warrantless searches and seizures, physical structures and their purposes matter. They're fundamental. And there is nothing unusual about finding that the nature of a physical structure has legal significance. U.S. law has long recognized this in protecting the sanctity of the home, of hotel rooms. Counsel, but, you know, a trauma room or an emergency room is not a person's home. And there have been many decisions that have held that there's no reasonable expectation of privacy in an emergency room in one of those bays in the emergency room or in a trauma room. Are we to depart from that? Well, Your Honors, most of those cases talk about emergency rooms in a general sense, the open areas of emergency rooms, not enclosed spaces like we have in this case. And so we have to consider that there is an intersection between the fact that he was in an emergency room and the fact that he was in an enclosed space, which brings this case much closer to, well, cases like Pearson and Gill, where you're in a private hospital room, where we would submit that you do have a reasonable expectation of privacy. And that gets back to the purpose of the structure, the physical presence of the four walls and the door here. May I ask you a fact question? Am I correct that at the motion to suppress, a nurse testified that the bloody clothes that we're going to be talking about, that were sought to be suppressed, were in plain view from the hallway, correct? She testified to that effect, yes. However, the two officers that actually seized the clothing both testified that they did not see it until they entered the room. Is there any testimony, any established facts as to whether the door, was there a door? First of all, is there evidence about whether it was a curtain or a door? And then secondly, at the time the police officers were in the hall, the nurse said that from the hallway the clothes were in plain view. Was the door open or closed? The door, I believe the record establishes that the door was open. No one disagrees that there was a door and it was open. And the police officers from the hallway could look in and in plain, and they were in the hallway, they could look in and see in plain sight the bloody clothes. According to Nurse Womack, that would have been possible. According to their testimony, they did not in fact see it until they entered the room. Is there any indication that your client asked them not to enter the room? No, there is no indication. However, and this goes to the fifth factor, I believe, as to whether or not there was an ability to control or exclude others. But as this court noted in Pittman, excuse me, I'm thinking of the sixth factor, the subjective expectation of privacy. As this court noted in Pittman, there is no affirmative duty for someone to take action. As long as they conduct themselves in a manner of a typical occupant of the space, the subjective expectation of privacy is going to be presumed. As it was in Pittman, there is no affirmative duty for a person to, you know, either get up and close the door or say, I don't want the police in here or anything like that. And this is a very important point here because what the appellate court and the state are suggesting is that a person in a hospital emergency room who may be in shock, may be under the influence of drugs or otherwise not in full possession of his or her faculties, is definitely in a weakened or compromised condition and has other things on his mind, still has an affirmative burden of either getting up and closing the door or making some sort of affirmative statement that he wants to bar all nonessential visitors. Well, how do we look at that given the fact that you're going to have, you know, hospital personnel coming in and out? I mean, if you've ever been in an emergency room, you just, I mean, there's no privacy almost in an emergency room. So how do we factor that in? And also, did your client tell the police that they could take the clothing? Answering the second question first, the evidence is not entirely clear. At the suppression hearing, the officers said, well, one of them asked and he gave permission. Nurse Womack said that he shook his head yes. But at trial, the evidence was they said, they simply stated they were going to take the clothing and he acquiesced or assented. So he did not affirmatively state that yes, you can take it. He just acquiesced. So there's a little bit of conflicting evidence as far as that is concerned. However, again, the officers have to get in the room first before they see the clothing in order to ask the permission, you know, and that's really what has to precede this. Did they have a right to go in there in the first instance? And that's really what we're talking about here. And I'm sorry, I forgot your first question. What about the nurses and doctors and all the people that come in and out? Sure. Obviously, if you're in a hospital setting, you have your reasonable expectation of privacy does not go to medical personnel. They're expected to be there. But this is a situation where there's a coextensive right to exclude, right? The hospital has the right to exclude the general public from that area. There's a barrier there. They have to ask permission like Mr. Turner's mother had to ask permission and had to wait before she was allowed access. But Mr. Turner also had a right to exclude people. This is typical in a hospital setting. If Mr. Turner, for example, had said, you know, I don't want my mother to see me like this, I don't think there's any doubt that the hospital personnel would have had to respect his wishes in that regard and exclude or say friends wanted to visit or whatever. There's a coextensive right to exclude, and that's something that the appellate court here appeared to have missed. They focused on whether or not he could have invited anyone in, and the hospital could have excluded whoever he wanted to invite in. That's not the analysis here. The question is did he have a right to exclude. What about the temporary nature of being in an ER as opposed to being maybe admitted into a hospital room? I mean, can we agree that you're going to be there for a very specific purpose for a temporary period of time and then either be leaving or being admitted into the hospital? Does that make a difference? I think that is one factor for the court to assess. However, I think it is outweighed by the factor of the purpose of the room, which is, you know, as this court stated in Pittman, the reason structures matter is that one of the inquiries we must make is whether the Aryan question, and I'm quoting the Pittman case, harbors the intimate activities commonly associated with the sanctity of a person's home and the privacies of life. Well, I would submit that being in a state of undress and vulnerability, experiencing physical pain, receiving medical treatment that exposes large parts of the body, being hooked up to monitors and an IV, these are all intimate activities that you don't want the general public to be gazing in on or observing. Is there a distinction between a curtained area or an area that is walled? What's the effect of the distinction, if any? I think it does matter. Again, this goes back to physical structures matter. I think you have a closer question, and as a matter of fact, in some of the other cases that have already been alluded to, where there's a curtain, it has less of a permanence, you have less of an expectation of privacy, as opposed to a solid physical barrier that we have in this case, which makes it much more analogous. Wait, wait, I thought the door was open. The door was open, just as the door was open in the three walls of the barn in the Pittman case. But as the court observed in the Pittman case, that did not, simply because it was possible to peer into the barn, did not suddenly turn this structure into a public thoroughfare where anyone could just go in or out. Could you address the statute that requires the hospital to notify the police if, in fact, a person presents himself with a gunshot wound? How does that factor in? Well, that factors in in that it's clear that the hospital had to admit the police into the general emergency room area. They had a right to be there. They had an obligation to be there. No one in this case, I think, certainly were not disputing that. But that doesn't get us to the question, and the larger issue is, all right, they have a right to be in the ER generally. Do they have a right to just enter the room without permission? And we submit, because of the nature of the structure, because it is so closely analogous to being in a motel room and the reasonable expectation of privacy there, being an overnight guest in a home, being in a phone booth as in the Katz case, being in an outbuilding, all of this other precedent showing that physical structures matter, they matter here, too. You do have that reasonable expectation of privacy when you're in this enclosed physical space, even with the door open, you would submit. But doesn't that statute affect, you know, the fifth factor, the ability to control access? I mean, because the hospital is mandated to report to the police, doesn't that affect, you know, who has access to that structure? I know you said only to the ER itself, but, I mean, they aren't coming generally to the ER. They're coming specifically because of the gunshot wound. And right, because they have, it's anticipated, of course, they're going to be investigating what happened. But there's certainly nothing in the statute that says that they then have the right to invade the patient's privacy in this manner. They have a right to be there, they have a right to investigate. Mr. Turner wasn't going anywhere, at least not without the police knowing about it. There's no indication they didn't have an opportunity to get a warrant if they needed to have a warrant in order to collect the clothing. Certainly they had a right to discuss with the nurse and the other medical personnel what happened, what did he tell you, what have you observed. None of that is in dispute here. But that's not really the question we're getting at in this case because what we have here is an invasion of the private room by the police without getting permission or a warrant or exigent circumstances. You know, no one was saying that the hospital was going to burn the clothing or anything like that. There is nothing of that nature here. Counsel, in determining whether a person has a reasonable expectation of privacy, the court is supposed to consider six factors. Which factors weigh in favor of the defendant? Well, we would argue that, or we have argued that, and it's undisputed, first of all, factor two is not in dispute. So the first three factors here are all settled. Factors one and three clearly are in favor of the state. Factor two is clearly in favor of Mr. Turner. So we're talking about factors four, five, and six. And we maintain that all of these factors weigh in favor of Mr. Turner. The prior, factor four is the prior use of the area search. And, again, we base this on the nature of the physical structure and the privacy one would normally expect in a private hospital room. Was he in a private hospital room? I mean, I know he was the only one in the room, but was he in a private hospital room? Yes. The room was described as very small. There's photographic evidence. It's State Exhibit 1. I think some of the others showed that it was a very small room. It was, you know, basically, I guess, the size of, I think someone compared it to a prison cell type situation. So are there private rooms generally in an emergency room? There were three such rooms in this hospital ER. The record did establish that. I mean, I guess every ER may be different. There may be emergency rooms where they don't have this, but they did at this particular hospital. Counsel, were they treatment rooms or private rooms? Because hospitals have treatment rooms. Are you saying this was designated as a private room, or was it a treatment room in the emergency department? It was clearly used for treatment. I'm not disputing that, but what I'm suggesting is that because it was designed for one occupant and it had this structure of the four walls and the door, it was intended for the private treatment of that patient. Well, can we agree that there are certain treatments that are performed in a hospital and in an emergency room that are only conducive to being done within the confines of a small space, and that would be something that would be done in a treatment room? Do you agree with that? I think that's fair, yes. Okay. So this was a treatment room? It was, yes. It was used for treatment, for assessment, and, you know, providing the first care while they were assessing whether he was going to be admitted or transferred, and he was ultimately transferred. So unlike a private room where you're admitted to the hospital, they take you to a room, and that is your private room, no one else is there with you, this was simply a room in the emergency department where an individual would be taken and maybe some testing done or them looked at to determine what the next step would be for them, but it's not a private room. Well, I guess I would submit it's private in the sense that it was designed for a single occupant, it was a small space, and, again, the nature of the structure makes it comparable to other enclosed spaces where courts have understood there to be a reasonable expectation of privacy. And you're talking about hotel rooms where you pay to rent a room, you can lock the door, you know, no one else can come in other than, I guess, potentially hotel staff. You're saying it's akin to that? Yeah, again, there's no perfect analogy, but I think it is more akin to that than it is to being in an open area of an ER like some of the other cases that the state and the appellate court relied upon. And you're asking for basically a bright-line rule that under circumstances such as these, a person has a right to exclude and no one should be able to enter. Not no one, medical personnel, yes, but the general public. Other than medical personnel. Agents of the state and general public, yes. And the courts in Gill and Pearson presume that, and I think just from common experience, this court can presume that, that, you know, not only does the hospital have the right to bar, but the patient has a right to bar just anyone from barging into his room. And you mentioned Gill, but in Gill that was a private hospital room where the patient was there for a significant period of time, is that right? That is, that does make one difference. In Pearson, however, it was much more comparable to the situation in the case. But in Pearson, the room was behind locked doors in an area that was not open to the general public, is that right? Yes, but in this case in a work... My understanding from Pearson is that it was comparable to this and that they did have access to the ER generally. Well, Pearson, did that involve the ER? If I recall, yes, this was in a trauma room. It was described as a trauma room. So I think it was very comparable to the incident case where police could access the area generally just as there was a gatekeep in here as well. You know, the members of the general public couldn't get past the main desk. Police could get past the main desk. They were required to get past the main desk so they could conduct their investigation. If the patient is in the room and the door is open, other patients are being wheeled by, right? Yes. Other visitors of those patients are walking by, right? I don't know that other visitors... Are you talking about once you get past the main...? Right. We're talking about the subjective expectation of privacy. Right. If a man is in this room, the door is open, people are walking up and down the hall, there are other patients, there are other, you know, visitors for those patients who are walking up and down the hall, right? That is probably true. Okay. Does that affect the reasonable expectation of privacy? I don't believe it does, Your Honor, because, again, it's the entry into the room that is the decisive factor here. The fact that they could walk by, fine. You know, he could have asked the nurse to shut the door, I suppose. But, again, in Pittman, and this gets to the sixth factor that was inquired about... I asked the question. The red light is on, but please conclude your argument, but continue to discuss the six factors. I'm sorry. Oh, I didn't realize I was out of time. Well, I'll just... I'm the one that slowed you down. Okay. Right. That's fine. Well, again, for the reasons discussed here as well as in the briefs, we would ask the court to find that Mr. Turner did have a reasonable expectation of privacy and that the decision to... and that the ruling to denying the motion to suppress should be reversed and his conviction vacated and set for a new trial. Thank you. Counsel for the appellate. Thank you, Your Honor. May it please the court, counsel, I'm Assistant Attorney General Michael Subula on behalf of the people of the state of Illinois. Your Honor, based on the argument we just heard, I think it may be helpful to put a few things in context and clarify a few things and some facts. In this appeal, the defendant is making an extraordinary request. He was convicted of murder after a bench trial in which two witnesses testified that he confessed that he participated in this deadly drive-by shooting during which he accidentally shot himself in the leg. It was confirmed by eyewitnesses who testified that the defendant was, in fact, in this car, in the back seat, participating in the drive-by shooting. It was further confirmed by forensic evidence which showed there was a bullet hole in the back seat consistent with someone accidentally shooting themselves in the leg. Now the defendant is asking this court to overturn his conviction merely because the prosecutor has also introduced evidence about the clothes he was wearing, such as the bullet hole in his pants. He says that evidence should have been suppressed, even though these are some facts he failed to grapple with or consider. Even though it's undisputed, he told everyone, including police, that he was the victim of the shooting. Even though it's undisputed, contrary to what my opponent just said, it was undisputed that he consented to the police taking his clothes, and the clothes were in plain view. His sole argument for overturning his murder conviction is, he says, police should have gotten a warrant before they entered this open room where, again, he was telling everyone he was a victim of the shooting. However, as the appellate court correctly said, defendant failed to prove the police needed a warrant because he's failed to prove he had a privacy interest that was protected by the Fourth Amendment. Now, obviously, it's the defendant's burden to make that showing, and in a case like this where everyone agrees he wasn't trespassing, he had a right to be in the room, there's five factors that matter. Whether defendant had an ownership interest in the room, whether he had a possessory interest in the room, his prior use of the room, his ability to control access, and his subjective expectation. Defendant admits he did not have an ownership interest in the room, and he had no possessory interest in the room. So right off the bat, two of the factors he admits are against him. The third factor, prior use, is clearly against him. Prior use has a very straightforward meaning. It's how long have you been in the space before the police recovered the evidence? Did you use it in the past? What's your connection to that place? And here, the record's clear. He never used this room before the night in question, and in fact, everyone agrees he entered the room at almost the exact same time the police did. The record shows he was only in that room being triaged for about 15 minutes before he told police, I'm a victim, take my clothes. As the appellate court correctly said, the law is clear. 15 minutes is not nearly enough to establish the prior use factor. Now, defendant doesn't dispute that. He doesn't argue that 15 minutes is enough. Instead, in his briefs and to some extent today, he asked his court to essentially create new law and to hold for the first time that if police recover evidence in a place with four walls and a door, that this factor is always, per se, irrelevant. I think he would say that this factor is only relevant if you're dealing with a space that doesn't have four walls and a door, which I guess would be a public park or maybe a dilapidated building. Well, Mr. Sabula, what about the Pearson case? That was not just four walls and a door. It was four walls and a door in an emergency room. Sure. So Pearson, I believe, there are some different factors in Pearson. In Pearson, there was evidence that the police tried to come back to get the evidence, and the hospital said, no, you're not allowed back there. So that's a different case where if you have hospitals not allowing police into certain circumstances, well, maybe that supports an argument that they need a warrant to enter. But there is nothing like that here. Pearson, again, I think to some of the questions I've got to you, that was a place where it was behind locked doors, public kept out. That is not the situation. There's no evidence of that. So in Pearson, even though it was in the technically the emergency room area, it was separated by a locked door where anybody had to be buzzed in to get access to that area, and the patient was in the room, and the door was shut, and it was only the patient and the individuals treating the patient, and so the police could not just even walk in the area where the room was located. Is that correct? That's my understanding of Pearson, and, in fact, not only did the police need authorization, there was evidence in that case that they needed authorization to get back there. There was also evidence that the police were denied authorization at some points when they tried to come back. So that's completely different in this case where the police entered into a room with an open door where they were, frankly, welcomed by a defendant. The defendant is saying, I'm a victim. The police say, can we take your clothes? Yes, take my clothes. I'm a victim. Investigate this shooting where I'm a victim. So I think certainly the prior use and the structure itself is not one that lends itself to Fourth Amendment protection. And all of this talk about four walls and a door, it's sort of beside the point when we're dealing with a case where the door was wide open and where the nurse is saying you can see from the hallway everything that's in there. So this is not a case where there's a locked door or a place for denied access. Counsel, is that the criteria, though, that the door was wide open? You know, if you're in a private hospital room and the door is open, do you still have a reasonable expectation of privacy for things that are, say, in your bedside, in the bedside table? I mean, what does the open door, what does the open door have to do with? Sure. They're all fact-dependent questions, right? So whether, you know, the defendant's asking for sort of a bright-line rule, but apart from a house or a hotel room that you're spending the night in, there's really no bright-line rules. Every case depends on its facts. So I think if you're dealing with a room that has an open door, that the hospital keeps open, where people are walking back and forth, I think it's harder to argue that you have a reasonable expectation of privacy. That doesn't mean that in no case you could possibly argue that you have one, but it's a factor to consider. And certainly in this case, there's no dispute. The record is very clear that these bloody clothes were in plain view, as the nurse testified to and counsel admitted, you could see it from the hallway. And I'm not saying that's determinative, but it's the defendant's burden to prove that he had a protected privacy interest, and that's a key fact that is clearly against him. The two final factors are the ability to control access and his subjective belief. In terms of the ability to control access, the appellate court got this exactly right. The appellate court said it presented no evidence that he could control access. The defendant, in his brief, doesn't really dispute that. He just offers a conclusory sentence that, well, obviously patients can't control access. But there's not really case law support for that, and that's because patients don't control access. They can't kick out a doctor or a nurse. They can't kick out a security guard. They can't kick out someone from the insurance department. If the hospital wants to put another patient next to you in a room, you can't kick them out. You don't control access within a hospital, as case after case that we cite in our brief points out. And I would also note counsel said that the cases we cite are sort of open-air rooms. That's incorrect. We cite cases that involve ICU rooms, which are fairly private. We cite trauma rooms within an emergency room. In all of those cases, courts ultimately found in the facts of those cases that the defendants did not have a protected privacy interest. The appellate court also got this exactly right on his subjective expectation. He presented no evidence of any kind that he had a subjective expectation of privacy. Think, again, when you take a step back and you look at the facts and you are coming into a hospital with a gunshot wound from a drive-by shooting and you are telling everyone that you are a victim of the drive-by shooting, you know the police are going to come to talk to you. You can't have a credible expectation of privacy in those circumstances. You know that, frankly, it's the police officer's obligation to investigate those kinds of crimes. There are statutes that require the hospital to contact police in a gun and ball shooting. So on these facts, you cannot credibly argue on the subjective expectation of privacy. Now, the defendant relies on the Pittman case. He says he doesn't have to present evidence of his subjective expectation as long as he acts as a typical occupant of the space. That's enough. That's not what Pittman held. Pittman dealt with whether the defendant had a privacy interest in a barn that his mother owned. He was using it to store drugs. At the time Pittman was cited, many years ago, there was case law that said barns are somehow different and they're sort of public by their very nature in rural areas. So therefore, if you want to claim a Fourth Amendment protection barn,  like putting up fences or keeping it constantly locked, the court in Pittman said, no, you don't have to do that with barns. You just have to act as a typical barn owner would. But in no way did the court say that simply by acting as a typical occupant of a space you have established you have a subjective expectation of privacy. I mean, obviously, I hopefully today am acting like a typical occupant of this room, but that doesn't mean that I have a subjective expectation that a police officer cannot walk in here without a warrant. So on this fundamental point of whether the police need a warrant, the appellate court got this exactly correct. The defendant failed to prove he had a privacy interest. It's correct about the Fourth Amendment. If I could just make a couple quick points as well, because I don't think the defendant really dealt with it in his brief for today. Even if technically this court were to find that the police should have gotten a warrant, the good faith exception to the exclusionary rule clearly applies. There's a couple ways to show good faith. One is that you look at the law that existed at the time the police obtained the evidence, and you ask whether a reasonable police officer would believe they needed a warrant. Well, the parties agree that there was absolutely no law in Illinois at the time the search occurred that suggested police needed a warrant. To the contrary, as we cite in the brief, there were multiple cases in Illinois and, of course, across the country that said police did not need a warrant. So they were clearly acting in good faith. Also, for the other reasons I mentioned, they were acting in good faith.  Shooting had just occurred. The police were told he was a gunshot victim. They walked by the room, the doors opened. So a police officer acting in good faith would believe they had the right to enter this room, certainly when they see bloody clothes in plain view. And the last point is that, for the reasons I mentioned earlier, obviously any error here is harmless, given the overwhelming nature of the other evidence against him, which includes multiple witnesses testifying that the defendant confessed to participating in the shooting, an eyewitness that placed him in the car, and the forensic evidence that showed so. This wasn't a key piece of evidence because it actually established that the shooting did not happen the way that the defendant had represented it did? I'm not saying it wasn't. It was certainly inculpatory, but it was cumulative to two witnesses who were his friends saying that he confessed, that he participated in the shooting, and that he accidentally shot himself in the leg during the shooting. And there was an eyewitness that said, yes, he was in the backseat of the car during the shooting. And there was forensic evidence that said there was a bullet hole in the seat of the backseat, which, based on the angle, was consistent with someone shooting themselves accidentally in the leg. So I'm not saying it was completely important or irrelevant, but it was really cumulative to a lot of other evidence. And again, in a bench trial like this, when you have multiple people saying he confessed, when you have an eyewitness, when you have other forensic evidence, I think the trial court would have reached the exact same conclusion, even if this evidence about the clothes was excluded. We found him guilty because he is, in fact, guilty of this murder. So unless there are any other questions, we ask this court to affirm the defendant's conviction. Thank you.  Let me go back. Counsel, may I ask you to pick up where we were just discussing about at the end of the day this evidence was admitted. And here you're asking for a reversal of this conviction because the evidence was admitted. You said improperly. And the arguments made here, there was a great deal of other evidence that was presented by the State, from eyewitnesses, from statements made by your client himself, and that, in fact, the forensic scientist who testified that she looked at the defendant's pants and she determined that there was a bullet hole caused by a gunshot fired at close range. And another forensic scientist, Mary Wong, testified the sleeve of the defendant's shirt had gunshot residue. I mean, there was no question he had a gunshot wound. Right. So why is this evidence that you say was improperly admitted so significant that the conviction should be overturned? In other words, why isn't this harmless error at most? Because absent the close, there is then no evidence that it was a close contact gunshot. Absent the close, there's no evidence that there was a downward trajectory, you know, where there was an entry wound in one part of the pants and an exit wound in the other part of the pants. Of his own wound, but not of the murderer. Right. What evidence here says anything about the actual murder case? Again, the close contact was only the forensic evidence could only be established with the pants. Without the pants, you don't. The man shot himself. I'm sorry? So the issue you're saying, it confirms that he himself accidentally shot himself, right? Right. It adds confirmation to the two witnesses. Isn't that what he told the police that he shot himself? No, he did not tell the police that he shot himself. His account was that he was walking down the street and he was hit by a stray bullet after hearing gunfire from some distance away. And there was evidence that he was outside walking some period before. The evidence that the state is talking about here are two witnesses that supposedly heard him confess, but they gave inconsistent stories. They told police something different beforehand. They admitted they told the police something different beforehand. One of the two, the Macy, excuse me, J.C. Marble, was herself involved. It was her car that was being driven. She disposed of some of the evidence in the case. She was involved in this. And as far as the other eyewitness that supposedly placed in the car, this was Cleophas Gaines, the person that was under the influence of promethazine, codeine, and cocaine. And the guy that was wildly inconsistent in his testimony told police initially didn't know anything about Mr. Turner there. Then gave a different story. He said that once the shooting started, he was on the floorboard, but he was still somehow able to see Mr. Turner in the backseat of the car. He placed him on the back passenger side, contrary to the state's theory that Mr. Turner was unnamed. And all of that I know was presented to the jury and argued as to the inconsistency. And the verdict was mirrored. I assume this is a jury. This is bench trial. The court rejected those arguments that you're making now. So I think the question comes back to what is so damaging about the admission of this evidence that, in fact, therefore a conviction should be overturned given the evidence that was accepted by the court? Well, first I should remind the court that the burden here is on the state to prove it was harmless beyond a reasonable doubt. So it's a heavy burden for them to meet. And in this case, again, only the pants establish that there was close contact, contradicting his story that he was just shot by a random bullet that came from somewhere as he was out on the street. And it's only the pants and the evidence of the pants that lines up with the forensic scientist's testimony that this kind of matches up with the downward trajectory of the bullet that was recovered from the car and that damaged the seat. So it hooked up a major part of the case. Absent the pants, all they've got is, you know, the cocaine Superman guy and the two witnesses who were compromised and said that he, you know, he gave a hearsay statement that where he supposedly admitted that he was in the backseat. So this was a key link here. The evidence against the other people that were more clearly involved was much stronger. This was a very, I mean, obviously it was enough to convince the court. But absent the pants, I don't think the state demonstrates that this was harmless error. And, you know, when you look at the evidence in their totality, as must be done. Your Honors, with respect to arguments presented by the state, the state begins by emphasizing that this is a man convicted of murder. Well, Your Honors, that's irrelevant in this inquiry. You don't get to backdoor a Fourth Amendment violation based on the seriousness of the offense. So that really doesn't really apply here. Mr. Turner did not say he was the victim of a drive-by shooting. That's a little bit of an exaggeration. He said that there was shots outdoors, he was walking on a public sidewalk, he went down and he got hit. That's what he said. And as far as the 15 minutes business, we talked about this quite a bit in the brief. Granted, time can be a factor in some instances, but the purpose and use of the physical structure weighs more heavily here. Just as in the case of the reasonable expectation of privacy in a home. There's no, if you just got home and you've only been home for less than 15 minutes, you still have a reasonable expectation of privacy. If you just enter a hotel room and the door is open and you just put your luggage down, you still have a reasonable expectation of privacy once you enter. Time does not matter here in these circumstances when you have the physical structure that is relevant here that creates that reasonable expectation of privacy. I'd also like to briefly address a counsel saying that there's this raft of cases that say that it doesn't apply to the emergency room context. The statement's brief cites some cases from other jurisdictions that do talk about this but on closer examination, there's less there than might appear. For example, in the State v. Reume case out of Vermont, Supreme Court of Vermont, the defendant was in a large two-bedroom separated by a curtain. He was on a gurney. He yelled out an incriminating statement that was not in response to a question, and it was not even a Fourth Amendment case. It was interpreting the law under a comparable provision of the Vermont Constitution that required the defendant to convey an expectation of privacy, to verbalize it. That's not the law in Illinois. That's not our case law. As a matter of fact, in the Pittman case, the subjective expectation of privacy does not require any affirmative statement. And, you know, it's one thing to put in a brief that Reume had collected cases on this, but take a look at some of these collected cases cited in Reume, like State v. Stott, where the Supreme Court of New Jersey also cited cases holding that there is no reasonable expectation of privacy in an emergency room generally, but that there is a reasonable expectation of privacy in an enclosed hospital room. Or Commonwealth v. Welch, which is the Massachusetts case cited by the State, the court there held that there was no search or seizure at all because the defendant invited officers into his room and voluntarily gave notes to the police. Now, the court did analyze the reasonable expectation of privacy of an intensive care room in that case in DFTA, but the factors applicable in Massachusetts, again, are different from what we have here in Illinois. They also required the defendant to make an affirmative showing of an expectation of privacy. So there's less there in citing these cases from other jurisdictions than one might suppose. And again, with respect to the sixth factor, this court in the Pittman case held that a defendant need not have taken affirmative steps to proclaim his expectation of privacy. He simply has to outwardly behave as the typical occupant of the space, which is the case here. So he did not manifest anything different. I see that my time is up. I thank the court for its attention and, again, ask for reversal on the motion to suppress. Thank you. Thank you very much. This case, which is agenda number two, number 129208, People of the State of Illinois v. Cortez-Turner, will be taken under advisement. Thank you both for your arguments.